JEFFERSON D. CAFFERY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Caffery v. Commissioner
Docket No. 2799-88
United States Tax Court
T.C. Memo 1990-498; 1990 Tax Ct. Memo LEXIS 551; 60 T.C.M. (CCH) 807; T.C.M. (RIA) 90498; September 20, 1990, Filed *551 Decision will be entered under Rule 155. William J. Friedman, Jr., for the petitioner. Stevens E. Moore, for the respondent. KORNER, Judge. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION For the calendar year 1979, respondent determined a deficiency of income tax against petitioner in the amount of $ 469,540.50, together with additions to tax under section 6653(b) [1] in the *552 amount of $ 234,770.25, and under section 6654(a) in the amount of $ 12,947.30. After a concession by respondent, we must decide whether respondent's determinations that petitioner received an unreported $ 650,000 of gross income in 1979, together with the associated additions to tax under sections 6653(b) and 6654, are correct. [2]
At the time of filing his petition herein, petitioner was a resident of Lafayette, La. He is a native of that area. After two years of college, petitioner worked at various jobs until the 1970's. At some point in this period, he *553 became involved as a principal in a decal publishing firm in Lafayette, La., and, in addition, he became involved in the distribution and sale of marijuana with a friend he had known from high school days, one Ted Suddereth. At some point still later in the 1970's, both petitioner and Suddereth became involved with an organization apparently headed up by Donald Koehl and Donald Segura (hereinafter sometimes "the organization"), which was engaged on a large scale in the importation and distribution throughout the United States of marijuana, an illegal drug. Petitioner's position in the organization was that of employee rather than being a principal. In the early part of his career, petitioner served in various capacities -- as a truck driver, as a weigher and checker of marijuana, as a courier for money, and as a helper in securing orderly distribution of the drug. Later on, the principals in the organization, Koehl and Segura, apparently concluding that petitioner was intelligent, presentable, and honest-looking, assigned more complicated duties to him, such as renting or buying items of equipment such as trucks and boats, securing space for the organization in warehouses and *554 the like, and even forming a dummy corporation for the organization in New York. Petitioner was paid varying amounts of money at various times by the principals, apparently based upon the availability of funds and the amount and quality of work which petitioner had performed for the organization. With one exception, described hereinafter, petitioner was always paid in cash. The amounts of cash which petitioner received varied, but tended to increase in the later 70's over the early 70's, as petitioner's status within the organization increased, and his responsibilities with it. In 1979, the last year in which the organization apparently functioned, petitioner was involved in two transactions dealing with the importation and distribution of marijuana. In both cases these imports arrived by ship off the south coast of Louisiana, and were brought ashore, distributed, and sold by various clandestine means. Petitioner was paid in cash for his participation in the first transaction from the ship Southern Breeze, and respondent determined this payment to have been in the amount of $ 150,000. The second and last transaction in which petitioner participated was the importation, distribution *555 and sale of marijuana from the ship Nordakroom. In the case of this incident, respondent determined that petitioner had received a payment for his participation in the amount of $ 500,000. These two 1979 transactions made up the additional income which respondent determined against petitioner. Petitioner filed an individual income tax return for 1979 in January of 1982, but no income from dealing in marijuana was disclosed therein. Up until this point, the facts which the Court has found are clear, reasonable and basically uncontroverted. When it comes to the actual amounts of income which petitioner received in 1979 from the Southern Breeze and Nordakroom shipments of marijuana, however, the evidence is in conflict. Respondent's witness Donald Koehl, one of the principals in the organization, testified on deposition by consent of the parties. The witness also relied in part upon a handwritten memorandum, prepared by himself prior to the deposition, which listed varying amounts of money paid to various-named individuals, including petitioner, with respect to the importation of marijuana in various-named vessels over a period of several years. With respect to the year 1979, *556 Koehl testified, and his memorandum indicated, that petitioner had received $ 150,000 for his participation in the Southern Breeze shipment, and $ 500,000 for his participation in the Nordakroom shipment. Koehl testified that he paid all these persons, including petitioner, personally and in cash. His testimony was clear and circumstantial, but, being given some ten years after the events in question, it appeared to the Court to be a little too clear and pat, and lacked any corroboration. Petitioner, on the other hand, disputed Koehl's testimony, and testified that he received only between $ 20,000 and $ 30,000 in cash with respect to the Southern Breeze shipment, and that he received no money at all in connection with the Nordakroom shipment. In the latter case, instead of receiving cash for his efforts, petitioner testified that he received a quantity of marijuana, jointly with Suddereth, which they could sell for their own account, but which first had to be purchased from the organization. In this respect, petitioner's testimony was corroborated on important details by the testimony of Suddereth, who had been another worker in the organization. We are thus confronted with an *557 irreconcilable conflict in the testimony with respect to the principal issue herein, both as to its nature and amount. With respect to the issue of the deficiency in this case, respondent's statutory notice of deficiency, after the concession, is presumptively correct and the burden of proof is on petitioner to show that it is wrong. ; Rule 142(a). In assessing the merit of a witness's testimony given in a trial before us, we need not accept a witness's testimony, particularly when it is uncorroborated, if the Court finds it to be unreasonable, improbable, or questionable. See , affg. ; , affg. . Furthermore, where a taxpayer's evidence is fragmentary, but there is a basis for making a finding of fact, the Court may do so, bearing heavily if it chooses on the party whose inexactitude and lapses of proof are of his own making. , affg. ; *558 see . Bearing these principles in mind, we think that with respect to petitioner's payments resulting from the Southern Breeze shipment, petitioner has failed to carry his necessary burden of proof to show that respondent erred. Although petitioner testified that he received only $ 20,000 to $ 30,000 from this shipment, and although this rather vague estimate was corroborated by the equally vague testimony of Suddereth, both these denials lack conviction to us. Given the responsible position which petitioner was filling in the whole operation of the organization, it appears to us that his version of the compensation was unrealistically low. Accordingly, with respect to this shipment, we accept the testimony of Koehl and respondent's determination that petitioner received $ 150,000. With respect to the Nordakroom shipment, however, we think that Koehl's testimony and respondent's determination have been successfully rebutted by the combined testimony of petitioner and Suddereth. Rather than Koehl's uncorroborated testimony of the flat payment of $ 500,000 in cash to petitioner, which we find unrealistically *559 large and questionable, we accept the combined testimony of petitioner and Suddereth that their compensation for participating in the Nordakroom shipment was to receive a quantity of marijuana, which they could dispose of for their own profit, but for which they had to pay the organization. We accept the testimony that the marijuana was turned over to petitioner and Suddereth jointly in the amount of 20,000 pounds, as estimated by petitioner, and we further accept petitioner's testimony that he and Suddereth were obligated to the organization for this marijuana at the rate of $ 230 a pound. We do not accept the testimony of Suddereth and petitioner that a major quantity (the testimony varied) of the marijuana was bad and unsalable, but we do accept the testimony that it was of low quality. The testimony was that in 1979, marijuana had a market value of between $ 200 and $ 1,000 a pound, depending upon quality. We find that the marijuana in question had a market value of $ 250 a pound. Accepting, then, petitioner's testimony that he and Suddereth received 20,000 pounds of marijuana at a cost to them of $ 230 a pound, and that the drug had a street value at that time of $ 250 a *560 pound, it results that petitioner and Suddereth jointly received marijuana having a value of $ 5 million dollars, against which they had a cost of $ 4,600,000. The gross receipts of $ 5 million dollars in value, less the cost of goods sold of $ 4,600,000, leaves a resulting gross income to petitioner and Suddereth jointly of $ 400,000, of which petitioner's one-half share was $ 200,000, and we find this to be the gross income which petitioner received from the Nordakroom shipment in 1979. [3]
*561 Adding together petitioner's income from both the 1979 ventures, it results that petitioner had additional income of $ 350,000 in 1979 which was unreported in his return. With respect to the addition to tax for fraud under section 6653(b), the burden of proof as to this issue is on respondent, who must prevail by clear and convincing evidence. Sec. 7454; Rule 142(b). Fraud, as used in section 6653(b), means actual intentional wrongdoing. . The intent required is a voluntary intentional violation of a known legal duty; in this case, to evade a tax believed to be owing. , cert. denied ; . Where direct evidence of fraudulent intent is not available, its existence may be determined from the conduct of petitioner and the surrounding circumstances. . The Supreme Court has stated that an " * * * affirmative willful attempt may be inferred from * * * any conduct, *562 the likely effect of which would be to mislead or conceal." cf. . The precise amount of underpayment resulting from fraud need not be proved. . The statute requires only a showing that "any part" of an underpayment results from fraud. In this case, respondent has met his necessary burden. Petitioner himself admitted that he received unreported income from marijuana smuggling in 1979 and that he deliberately did not report it in his income tax return for that year. The necessary elements for fraud under section 6653(b) are thus satisfied: the receipt of unreported income and the deliberate and intentional failure to report it so as to evade the necessary tax. With respect to the addition to tax for failing to make estimates under section 6654, the burden of proof on this issue is likewise on petitioner. . Petitioner offered no evidence at all on this subject, and the return filed by petitioner shows that he failed to claim any credit for installment payments made. We decide this issue in favor *563 of respondent. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Respondent's statutory notice herein determined that petitioner received $ 700,000 of unreported gross income in 1979. On brief, respondent has conceded that this figure was $ 50,000 too high, and that the correct amount in issue is $ 650,000.↩
3. Sec. 280E disallows any deduction or credit from gross income for expenses incurred in carrying on the illegal trade or business of trafficking in drugs. However, this section is effective only for years ending after September 3, 1982, and the year before us is 1979. In any case, we are not here dealing with a deduction or credit against gross income, but rather the adjustment for effective cost of goods sold, which is necessary to convert gross receipts into gross income. See S. Rept. 97-494, to accompany H.R. 4961 (now Pub. L. 97-248) at 309 (1982).↩